UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DAVID A. GEORGE and
TINA N. GEORGE,

      Plaintiffs,

v.                     Civil Action No.  2:08-0141

KANAWHA COUNTY SHERIFF'S DEPARTMENT and
SHERIFF MIKE RUTHERFORD and
OFFICER J. M. VERNON and
OFFICER DICK COLL,

      Defendants

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are a motion for summary judgment filed March 4, 2010, by plaintiffs David A. and Tina N. George and a motion for summary judgment filed March 5, 2010, by the Kanawha County Sheriff's Department ("KCSD"), Sheriff Mike Rutherford ("Sheriff Rutherford"), and Deputy J.M. Vernon ("Deputy Vernon").

I.

      This action was previously referred to Mary E. Stanley, United States Magistrate Judge, who has submitted her Proposed Findings and Recommendation ("PF&R") pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B).  The court has reviewed the PF&R entered by the magistrate judge on December 8, 2010.  The

magistrate judge recommends that defendants' motion for summary judgment be granted insofar as it seeks dismissal of plaintiffs' claims against the KCSD, the official and individual capacity claims against Sheriff Rutherford, and the "strobe light" claims against Deputy Vernon arising out of a traffic stop involving plaintiffs, and denied in all other respects. The magistrate judge further recommends denial of plaintiffs' motion for summary judgment respecting their Fourth Amendment claim against Humane Officer Dick Coll for his alleged (1) warrantless entry their home, and (2) unlawful seizure of their canine. The recommendation is based upon the existence of genuine issues of material fact.

On December 22 and 23, 2010, respectively, Deputy Vernon and plaintiffs objected to the PF&R. Having reviewed the matter de novo, plaintiffs' objections are meritless. The objections raised by Deputy Vernon warrant further discussion in view of Deputy Vernon's qualified immunity defense.

II.

A.   The Law Governing Qualified Immunity

The defense of "'qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  A two-prong test guides the inquiry.  Id. at 815-16.  First, a court should determine if a plaintiff's allegations give rise to a constitutional deprivation.  Id.  If so, the court examines "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct."  Id. at 816. The sequencing of the steps is immaterial following Pearson. A district court may, in the sound exercise of its discretion, determine which prong to address first.  See id. at 818-22.

B.   Claims Alleged by Ms. George Against Deputy Vernon

The claims alleged solely by Ms. George arise from her September 17, 2007, arrest by Deputy Vernon.  The first claim is

3

grounded in the Fourth Amendment, namely, an illegal seizure based upon her putatively unlawful arrest on that date.

The second claim is for malicious prosecution.  The alleged malice stems from Deputy Vernon refiling, on April 10, 2008, the charges against Ms. George relating to her September 17, 2007, arrest after they had been earlier dismissed.  The court understands this second claim to rest upon both federal civil rights and state common law.  It is thus necessary to parse the governing law respecting both the federal and state portions of the malicious prosecution claim.

As suggested in <u>Brooks v. City of Winston-Salem</u>, 85 F.3d 178 (4th Cir. 1996), and reiterated in <u>Lambert v. Williams</u>, 223 F.3d 257, 261 (4th Cir. 2000), the federal portion of the malicious prosecution claim is based on the Fourth Amendment's illegal seizure branch.  <u>Lambert</u>, 223 F.3d at 262 ("Our analysis in <u>Brooks</u> . . . makes clear that there is no such thing as a '§ 1983 malicious prosecution' claim.  What we termed a 'malicious prosecution' claim in <u>Brooks</u> is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution -- specifically, the requirement that the prior proceeding terminate favorably to the plaintiff.").

4

Prior to pronouncing the parenthetical observation immediately preceding, the court of appeals in Lambert had observed that the common-law tort of malicious prosecution consists of four "well-established" elements, namely, "(1) the initiation or maintenance of a proceeding against the plaintiff by the defendant; (2) termination of that proceeding favorable to the plaintiff; (3) lack of probable cause to support that proceeding; and (4) the defendant's malice." Id. These elements are similar to those that apply to the counterpart, West Virginia state common-law portion of Ms. George's malicious prosecution claim. See Clark v. Druckman, 218 W. Va. 427, 433-34, 624 S.E.2d 864, 870-71 (2005) ("In order '[t]o maintain an action for malicious prosecution it is essential to prove: (1) That the prosecution was malicious; (2) that it was without reasonable or probable cause; and (3) that it terminated favorably to plaintiff.'" (quoting syl. pt. 1, Lyons v. Davy-Pocahontas Coal Co., 75 W. Va. 739, 739, 84 S.E. 744, 744 (1915)).

More recently, however, in Snider v. Seung Lee, 584 F.3d 193, 199 (4th Cir. 2009), the court of appeals suggested that only two elements of proof apply to the federal analogue, namely, that there was "an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure."

Id.  Further, the Brooks decision appears to have long ago
disavowed the necessity of demonstrating malice on the federal
portion of the claim in view of the settled, objective nature of
the Fourth Amendment inquiry.  Brooks, 85 F.3d at 184 n.5.

Irrespective of the precise formulation of the
elements, however, it seems apparent that the existence of
probable cause would doom both the federal and state portions of
the malicious prosecution claim.  This is so inasmuch as the
absence of probable cause is an element of the state portion and,
as to the federal portion, an arrest and prosecution supported by
probable cause would conclusively demonstrate the reasonableness
of the seizure and prosecution.  The existence of probable cause
would also foreclose Ms. George's unlawful arrest claim.  A
discussion of the probable cause requirement is thus warranted.

Probable cause is "'defined in terms of facts and
circumstances sufficient to warrant a prudent man in believing
that the [suspect] had committed or was committing an offense.'"
Id.; Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (internal
quotation marks omitted and alterations in original).  The
existence of probable cause "always turns on two factors in
combination: the suspect's conduct as known to the officer, and
the contours of the offense thought to be committed by that

6

conduct." <u>Pritchett v. Alford</u>, 973 F.2d 307, 314 (4th Cir. 1992). So "[p]robable cause . . . could be lacking . . . either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." <u>Id.</u> When no reasonable officer could believe, in light of the circumstances of the offense, that probable cause exists, there is a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause. <u>See</u> <u>Smith v. Reddy</u>, 101 F.3d 351, 356 (4th Cir. 1996).

Our court of appeals has applied these principles in a setting analogous to this case. In <u>Rogers v. Pendleton</u>, 249 F.3d 279, 285 (4th Cir. 2001), the court of appeals addressed whether "a reasonable police officer could have believed that arresting Rogers on charges of . . . impeding an officer was lawful, in light of clearly established law and the information the officers possessed." <u>Id.</u> at 290. Following complaints from neighbors concerning noise at his home, and an on-the-scene encounter with responding law enforcement officers, Rogers was arrested. The officers contended that the action was warranted in light of Virginia Code section 18.2-460(A), which prohibited "[A]ny person without just cause knowingly obstruct[ing] a . . . law enforcement officer . . . in the performance of his duties . . . ." Va. Code Ann. § 18.2-460(A).

7

The court of appeals summarized the analysis in this way:

> The key issue is whether under any reasonable interpretation of § 18.2-460(A), Rogers' actions constituted a violation of that provision.  Because the probable cause inquiry is informed by the "contours of the offense" at issue, we look to Virginia cases to determine the reasonable scope of § 18.2-460(A).
>
> . . . .
>
> We . . . conclude that Rogers' behavior, if indeed it was of the sort described by Rogers . . . was not a violation of § 18.2-460(A), and thus Rogers was arrested without probable cause in violation of the Fourth Amendment because the "contours of the offense," . . . did not encompass his conduct.

Id. at 291 (emphasis added).

Turning to the instant circumstances, Deputy Vernon arrested Ms. George on September 17, 2007, based upon an alleged violation of West Virginia Code section 61-5-17(a).  The statute provides as follows:

> Any person who by threats, menaces, acts or otherwise, forcibly or illegally hinders or obstructs, or attempts to hinder or obstruct, any law-enforcement officer . . . acting in his or her official capacity is guilty of a misdemeanor . . . .

W. Va. Code § 61-5-17(a) (emphasis added).  The decisional law interpreting the statute is a bit muddled.  On the one hand, the Supreme Court of Appeals of West Virginia has made clear that merely inquiring of or challenging an officer, or standing silent

8

in the face of his questioning, would not constitute an offense under the statute. For example, in State v. Davis, 199 W. Va. 84, 483 S.E.2d 84 (1996), the West Virginia court noted that it is perfectly legitimate for an individual to "'without the use of fighting or insulting words or other opprobrious language and without forcible or other illegal hindrance, [ask a law enforcement officer] to leave . . . [his or her] premises . . . .'" Id. at 87, 483 S.E.2d at 87 (quoting State ex rel. Wilmoth v. Gustke, 179 W. Va. 771, 771, 373 S.E.2d 484, 484 (1988)); see also State v. Jarvis, 172 W. Va. 706, 709, 310 S.E.2d 467, 470 (1983)(stating that "a person does not violate the law by doing what he has a lawful right to do, regardless of whether it obstructs or hinders a police officer."); State v. Carney, 222 W. Va. 152, 157, 663 S.E.2d 606, 611 (2008) (noting that "lawful speech will not support an obstruction charge" and that "not every hindrance to a police investigation rises to the level of a colorable offense under West Virginia Code § 61-5-17(a)."); Gustke, 179 W. Va. at 773, 373 S.E.2d at 486 (noting "the general rule that when done in an orderly manner, merely questioning or remonstrating with an officer while he or she is performing his or her duty, does not ordinarily constitute the offense of obstructing an officer.").

The decision in <u>Davis</u>, however, illustrates that uncertainty may arise as to when a concerned citizen crosses the section 61-5-17(a) boundary line:

> The words "forcibly or illegally" as "used in the statute clearly mean any unlawful interference with the officer in the discharge of his official duties, whether or not force be actually present." "'To "interfere" is to check or hamper the action of the officer, or to do something which hinders or prevents <u>or tends to prevent the performance of his legal duty</u>; and to "obstruct" signifies direct <u>or indirect opposition or resistance to the lawful discharge of his official duty</u>.'"

<u>Id.</u> at 87, 483 S.E.2d at 87 (citation omitted) (emphasis added).

In the complaint, Ms. George concedes that she was "IN AN AGITATED STATE" after Deputy Vernon appeared at her home in response to her plea that Humane Officer Coll was harassing her. (Compl. at 1). She also appears to concede that she was "CURSING AT THE HUMANE OFFICER" in Deputy Vernon's presence, along with directing the same colorful language at Deputy Vernon. (<u>Id.</u> at 2, 4). Ms. George admits that she became increasingly agitated as the encounter progressed. She continued to yell and curse at Deputy Vernon and Humane Officer Coll throughout, as Deputy Vernon repeatedly attempted to calm her down. She professes as well that she was "very . . . upset." (Dep. of Tina George at 61; <u>see also</u> Compl. at 5 ("HOW WAS PLAINTIFF TO CALM DOWN, WHEN THE ARRESTING OFFICER IS INTENTIONALLY KEEPING THE ACTUAL PROBLEM

10

(THE HUMANE OFFICER) THEIR [sic], KNOWING HE IS THE REASON . . .
PLAINTIFF IS UPSET[.]").

During her deposition, Ms. George admitted that Deputy
Vernon cautioned her to "calm down, that . . . [she] needed to
settle down . . ." and that he was "trying to calm . . . [her]
down." (Tina George Dep. at 59, 61 (conceding further that she
was at "wit's end" at the time)). She testified as well to the
following exchange:

> Q   Okay.  [W]as it at that point that he told you,
> "If you don't calm down, I'm going to have to detain
> you.  I'm going to have to put handcuffs on you"?
>
> A   Yeah.
>
> Q   Okay.  And did you calm down --
>
> A   No.
>
> Q   (continuing) or did that make you even more upset?
>
> A   That upset me more, because he still kept me
> between himself and Coll.

(Id. at 70).[1]

According to Deputy Vernon, Ms. George at one point
began waiving and flailing her arms aggressively toward him and

---

[1]Ms. George's level of frustration is exhibited by the
undisputed fact that, following her arrest, she butted her head
against the law enforcement cruiser with sufficient force to
damage it.

11

Humane Officer Coll.  Ms. George admits as much, conceding that
she was moving her arms around and "speaking with . . . [her]
hands."  (Dep. of Tina George at 66).  This occurred in the
somewhat confined area on her front porch.  When his repeated
efforts to calm her failed, Deputy Vernon  stepped back away from
Ms. George and placed her in handcuffs.  Deputy Vernon believed
that his failure to secure Ms. George at that moment could have
resulted in her physically assaulting either himself or Humane
Officer Coll.

        Once called to the residence by Ms. George, Deputy
Vernon was obliged to investigate the ongoing incident that she
reported.  In addition to his fear of an imminent assault, Deputy
Vernon's testimony is undisputed respecting the effect of Ms.
George's actions upon his investigation:

> I mean, she -- I couldn't figure out what was going on
> with the initial harassment or involvement. I couldn't
> figure out anything. I mean, due to her behavior, both
> verbally and physically, I couldn't figure out what was
> going on. She totally obstructed my investigation to
> figure out the facts of what the allegations were on
> the scene.

(Dep. of J.M. Vernon at 74-75).

        In the midst of the tense and confusing circumstances
confronting him, Deputy Vernon was not obliged to guess right
about whether Ms. George had crossed the evanescent line between

12

protected First Amendment speech to the prohibited obstruction or hindrance of a law enforcement investigation.  In view of the undisputed effect of Ms. George's admitted actions on Deputy Vernon's ability to investigate the incident, and her repeated unwillingness to yield after having been cautioned, it was appropriate for Deputy Vernon to apprehend her behavior to constitute an obstruction and hindrance to his investigative duties within the "contours of the offense" stated at section 61-5-17(a).  A reasonable officer under the same circumstances would have concluded likewise.

The court, accordingly, concludes that Deputy Vernon is entitled to qualified immunity, and hence summary judgment, respecting the unlawful arrest claim and the federal civil rights and West Virginia state common-law malicious prosecution claim alleged by Ms. George.  The court ORDERS that defendants' motion for summary judgment as to these two claims be, and it hereby is, granted.

C.   Claims Alleged by David George Against Deputy Vernon

Mr. George alleges that traffic stops of his vehicle by Deputy Vernon on October 10, 2007, and February 27, 2008, were in

13

retaliation for complaints that he had previously filed respecting, _inter alia_, Deputy Vernon's treatment of Ms. George. During an October 13, 2010, evidentiary hearing conducted by the magistrate judge, Deputy Vernon, Mr. George, and the court were discussing the arrival of Deputy Vernon at the George residence on September 17, 2007.  The following exchange occurred:

> THE COURT: Okay. So [Deputy] Vernon pulls up. Now . . . have you ever had any contact with the Georges before?
>
> DEPUTY VERNON: I'm not sure, but we discussed -- I had made contact with them, I don't know, I'm pretty sure before this incident, either -- I had knowledge that they -- I had warned them about the Tennessee tag on the vehicle; and I can't recall if it was before -- it was at the Dollar General at Campbells Creek and we were taking care of an incident there, or there was something -- they were stopped there and they provided ID -- I believe it was Mr. George provided ID.  And I was aware -- I had knowledge that he -- because they told me, "We live right up there on Campbells Creek," and I warned Mr. George originally and said, "Make sure you take care of that," or some effect. But I had had contact, but when I came up on the scene here, I didn't recognize her. She was just a passenger in the vehicle. You know, it wasn't until -- you know, Mr. George is the one I had contact with at that initial presence.
>
> THE COURT: And how long before September 17th do you think that was?
>
> DEPUTY VERNON: To be honest with you, ma'am, I don't recall. It was -- it was probably a good -- good -- a lengthy time. Like I said, when I -- when I came on the scene of this incident I didn't recognize her from -- from -- it was Mr. George I'd had recognized -- I mean had talked to. It was evening, late hours. It was after dark, so I didn't really have a whole lot of contact with the passenger of the vehicle.

(Tr. at 20-21).[2]  While this account meanders a bit, it appears
that Deputy Vernon had, prior to the September 17, 2007, arrest
of Ms. George, warned Mr. George about his failure to secure a
West Virginia license and registration after moving here from
Tennessee.  Deputy Vernon had earlier elaborated on this point in
his affidavit, which states as follows concerning the October 10,
2007, traffic stop: "Mr. George's motor vehicle had a Tennessee
license plate, despite living in West Virginia for several
years."  (Aff. of Dep. J.M. Vernon ¶ 24).  The same affidavit
reflects that at the time of the February 27, 2008, traffic stop
Mr. George "still had a . . . Tennessee license plate."  (Id. ¶
34).

        West Virginia Code section 17A-3-1a(a) provides as
follows:

        Every owner of a motor vehicle. . . shall, within
        thirty days after taking up residence in the state,
        apply to the division and obtain registration and title
        for the vehicle.

Id.  Subsection (b) creates a rebuttable presumption of residency
if "[t]he person resides or has continuously remained in this
state for a period exceeding thirty days except for infrequent or

_____

        [2]Mr. George made no response to this testimony during the
evidentiary hearing.  On November 22, 2010, Mr. George submitted
a handwritten document which appears to be an attempt to
supplement the transcript of the evidentiary hearing with
additional facts and argument.  He does not challenge the factual
content of Deputy Vernon's claim.

brief absences."  W. Va. Code § 17A-3-1a(b)(4).  West Virginia

Code section 17A-3-1(a), entitled "[m]isdemeanor to violate

provisions of article; penalty" specifically provides as follows:

> It is unlawful for any person to drive . . . upon any
> highway any vehicle of a type required to be registered
> under this article which is not registered . . . .

Id.  The violation of this provision constitutes a misdemeanor

according to section 17A-3-1(b).

Inasmuch as Deputy Vernon, after warning Mr. George of

the plate violation at some unspecified earlier time, could

readily observe the offending Tennessee plate on both later

occasions when he stopped Mr. George, it was reasonable for him

to conclude that Mr. George was in continued violation of section

17A-3-1a(a).  That conclusion is significant in light of settled

case law in this circuit.

In United States v. Kellam, 568 F.3d 125 (4th Cir.

2009), our court of appeals observed as follows:

> We utilize an objective test for assessing whether a
> vehicle stop for a minor traffic violation was
> pretextual.  Under this test, "if an officer has
> probable cause or a reasonable suspicion to stop a
> vehicle, there is no intrusion upon the Fourth
> Amendment. That is so regardless of the fact that the
> officer would not have made the stop but for some hunch
> or inarticulable suspicion of other criminal activity."

Id. at 136.  In light of the objective nature of the inquiry, it

is likewise of no moment that Deputy Vernon may have harbored

some retaliatory animus in making the two traffic stops.  Brigham
City, Utah v. Stuart, 547 U.S. 398, 404 (2006) ("An action is
reasonable under the Fourth Amendment, regardless of the
individual officer's state of mind, as long as the circumstances,
viewed objectively, justify the action.  The officer's subjective
motivation is irrelevant.") (citation, internal quotation marks
and alteration omitted)).

     Confronted with Mr. George's undisputed, continued
violation of the law respecting registration of his vehicle, it
was reasonable for Deputy Vernon to perform the two challenged
traffic stops.  The additional, and disputed, stop sign violation
cited during the second stop is thus immaterial.  The court,
accordingly, concludes that Deputy Vernon is entitled to
qualified immunity, and hence summary judgment, respecting the
alleged illegal stops of Mr. George on October 10, 2007, and
February 27, 2008.  The court ORDERS that defendants' motion for
summary judgment as to these two claims be, and it hereby is,
granted.

D.   Claims Alleged Jointly by Plaintiffs Against Deputy Vernon

     The final cause of action, which is alleged by both Mr.
and Ms. George, is best characterized as a First Amendment

17

retaliatory prosecution claim of the type discussed in <u>Hartman v.</u>
<u>Moore</u>, 547 U.S. 250 (2006).  It appears plaintiffs assert that
the April 10, 2008, refiling of the previously dismissed charges
against Ms. George was in retaliation for their institution of
this civil action on March 3, 2008.

In <u>Hartman</u>, plaintiff asserted that certain prosecutors
and postal inspectors engineered his prosecution in retaliation
for his lobbying efforts.  The Supreme Court observed that "the
law is settled that as a general matter the First Amendment
prohibits government officials from subjecting an individual to
retaliatory actions, including criminal prosecutions, for
speaking out . . . ."[3]  <u>Id.</u> at 256.

At the same time, however, the Supreme Court imposed a
pleading and proof requirement for such a claim that several
courts of appeal had previously concluded was unnecessary.
Writing for the majority, Justice Souter stated the rule:

> Because showing an absence of probable cause will have
> high probative force, and can be made mandatory with
> little or no added cost, it makes sense to require such
> a showing as an element of a plaintiff's case [for
> retaliatory prosecution], and we hold that it must be
> pleaded and proven.

---

[3]The court will assume, without deciding, that the same
proscription applies to a citizen's First Amendment right, such
as the filing of this civil action, to petition the sovereign for
redress of grievances.

Id. at 265-66; see also Martin A. Schwartz, Section 1983 Claims &
Defenses § 3.11 (elec. ed. 2010) ("Thus, just as plaintiffs
asserting common-law and Fourth Amendment malicious prosecution
claims must establish lack of probable cause, plaintiffs
asserting First Amendment retaliatory prosecution claims must
establish lack of probable cause.").[4]

Given the disagreement between the courts of appeal
following Hartman, it would be perfectly reasonable for a law
enforcement officer to have concluded anytime between 2007 and

_____

[4]The court notes a dissimilarity between this case and
Hartman.  The circumstances in Hartman involved prosecutorial and
law enforcement decisions to pursue charges.  This case involves
only the latter.  The courts of appeal are presently mired in
disagreement respecting whether the Hartman probable-cause
requirement applies when a prosecutor is absent from the
retaliatory equation.  Compare, e.g., Williams v. City of Carl
Junction, 480 F.3d 871, 876 (8th Cir. 2007) ("We agree with the
Sixth Circuit that the Supreme Court's holding in Hartman is
broad enough to apply even where intervening actions by a
prosecutor are not present, and we conclude that the Hartman rule
applies in this case."), and Barnes v. Wright, 449 F.3d 709, 720
(6th Cir. 2006), with Skoog v. County of Clackamas, 469 F.3d
1221, 1234 (9th Cir. 2006) (stating "[T]he rationale for
requiring the pleading of no probable cause in Hartman is absent
here. This case presents an "ordinary" retaliation claim."); see
also John Koerner, Between Healthy and Hartman: Probable Cause in
Retaliatory Arrest Cases, 109 Colum. L. Rev. 755, 775, 776 (2009)
(stating "Retaliatory arrest case law is a mess, with some courts
siding entirely with Hartman, others rejecting [the application
of] Hartman [to retaliatory arrest matters] outright, and still
others having yet to take a position" and noting the majority
position requires, like Hartman, that a plaintiff plead and prove
probable cause).  The court need not choose between the
approaches for purposes of adjudicating plaintiffs' claim.

this date that probable cause would provide a complete defense to an arrestee's, or an accused's, claim of retaliatory arrest and prosecution.  As noted, a reasonable officer in Deputy Vernon's position would have permissibly surmised that probable cause existed for purposes of arresting Ms. George on September 17, 2007.  This same probable cause construct supported the refiling of the charges against her on April 10, 2008, irrespective of any animus harbored by Deputy Vernon at that time.[5]

The court, accordingly, concludes that Deputy Vernon is entitled to qualified immunity, and hence summary judgment, respecting the First Amendment retaliatory prosecution claim alleged by plaintiffs.  The court ORDERS that defendants' motion for summary judgment as to this claim be, and it hereby is, granted.

This case will proceed to trial solely on the warrantless entry claim against Deputy Vernon and Humane Officer Coll along with the unlawful seizure claim against Humane Officer Coll surrounding his taking of the Georges' canine.

---

[5]To the extent that Mr. George alleges that a First Amendment violation arose from Deputy Vernon pulling him over on October 10, 2007, and February 27, 2008, the same analysis applies.  As noted, both traffic stops were supported by probable cause.

Accordingly, following a _de novo_ review, the court concludes that the recommended disposition is correct except as otherwise stated herein.  The court, accordingly, ORDERS as follows:

1. That the magistrate judge's PF&R be, and it hereby is, incorporated herein except insofar as it concludes that genuine issues of material fact remain with respect to the claims discussed in sections II.B, II.C, and II.D;

2. That this matter be, and it hereby is, set for further pretrial development and trial according to the schedule entered by separate order today.

The Clerk is directed to forward copies of this written opinion and order to counsel of record, the _pro se_ plaintiffs, and the United States Magistrate Judge.

DATED: January 11, 2011

John T. Copenhaver, Jr.
United States District Judge